IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Case No. _____

**SANDRA SQUALLS**
   **Plaintiff,**

**v.**

**PFIZER, INC.**
   **Defendant,**

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff, **SANRDA SQUALLS**, by and through her attorneys, Berenbaum Weinshienk,

P.C., for her Complaint and Jury Demand states:

### I.   PARTIES

1.     Plaintiff, Sandra Squalls ("Ms. Squalls") is a resident of the state of Colorado.

Ms. Squalls is an African-American female and citizen of the United States.

2.     Defendant Pfizer, Inc. ("Pfizer") is a Delaware Corporation, with its principle

place of business in New York.  Pfizer transacts business in Colorado and other states, and has

registered with the Colorado Secretary of State as a foreign corporation authorized to do transact

business in Colorado.  At all times relevant to this case Pfizer was conducting business activities

in the state of Colorado.

### II.   JURISDICTION & VENUE

3.     This is an action for damages arising under Title VII of the Civil Rights Act of

1964 and 42 U.S.C. §1981 among other laws.

4.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§1331 because a federal question is involved.  Alternatively, this Court has subject matter

jurisdiction pursuant to 28 U.S.C. §1332 because there is diversity of citizenship and the amount

in controversy exceeds $75,000 exclusive of interests, costs, and attorenys' fees.  The Court also

has jurisdiction over the Title VII claim pursuant to 42 U.S.C. §2000e-5.

5.      The Court has personal jurisdiction over the Defendant because it has consented

to jurisdiction by appointing registered agents within the State of Colorado for service of

process.

6.      Alternatively, the Court has personal jurisdiction over Defendant because it has

transacted business in the State of Colorado and this action arises out of such transaction of

business.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a

substantial part of the vents or omissions giving rise to the claim occurred in the District of

Colorado.

## III.     GENERAL ALLEGATIONS

8.      Ms. Squalls was a Senior Professional Healthcare Consultant with Pfizer.  She

began her employment with Pfizer on October 25, 1990 as a Healthcare Representative in

Chicago, Illinois.

9.      Within two years she was promoted to a District Hospital Representative (DHR)

position in Chicago, Illinois.  Ms. Squalls successfully managed a large urban district for six

years.

2

10. In 1996, Ms. Squalls relocated to Denver, Colorado as an Institutional Hospital Representative (IHR). After two years, Ms. Squalls was promoted to District Manager for the start up of the Steere Division in Chicago.

11. In 1999, Ms. Squalls returned to Colorado as a Senior Professional Healthcare Consultant (SPHC) in the Denver South Cardiovascular District. Ms. Squalls made the move to Colorado to be closer to family.

12. Ms. Squalls' duties included: educating the doctors on Pfizer products, including explaining the proper doses and side effects. Ms. Squalls also hosted speaker luncheons and dinner programs to further educate the doctors in her territory. At the time of her termination, Ms. Squalls was primarily responsible for educating doctors on the drugs Lipitor and Caduet. She had successfully launched seven to eight Pfizer products in her seventeen years of employment.

13. Ms. Squalls' performance while at Pfizer was exemplary. Over the course of her tenure with Pfizer, she won the prestigious "Vice President's Club" award for top performers four times, a rare achievement within the company and was only one within two in her region that had won this award four times. She was a leader from the time she started with Pfizer and was asked numerous times to act as a mentor to new employees and as a guest trainer for Pfizer in New York. Ms. Squalls was three months away from achieving the rank of "Master" which is bestowed on those few employees who combine years of service with excellent performance at the time of her termination.

14. Ms. Squalls' level of performance had been consistently excellent in four different territories. Ms. Squalls was ranked the top rated performer in the Rocky Mountain Region immediately prior to her termination.

15.     Ms. Squalls was fully qualified to perform the duties of her position.

16.     Ms. Squalls satisfactorily performed the duties of her position.

17.     Despite Ms. Squalls' superior performance and almost two decades of service
with Pfizer, she became the victim of discrimination and retaliation perpetrated by her most
recent supervisor.

*Discrimination by New Supervisor*

18.     Chris Stoll became Ms. Squalls' supervisor in September 2005, when, after company
realignment, he managed one of the three cardiovascular divisions in the Denver Metro area. For
the first three months of Mr. Stoll's management, Ms. Squalls' was out of the office for
scheduled surgery.  Upon hearing that Ms. Squalls had been assigned to his team, Mr. Stoll told
another co-worker that he "didn't know about this one" in reference to Ms. Squalls.  In May or
June 2006, Mr. Stoll, on company voicemail, asked Ms. Squalls to deliver samples of the drug,
Lipitor, to Dr. Chris Verkler, a Denver-area physician that fell within her territory.  The request
was not proper because he also asked Ms. Squalls to put the name of Stoll's nanny on the Lipitor
box and informed her that his nanny would pick up the medication from Fr. Verkler, who
happened to be the nanny's personal doctor.

19.     Ms. Squalls was extremely uncomfortable with what Mr. Stoll asked her to do
because delivery of drug samples in such a manner was clearly against Pfizer company policies.
On her next regularly scheduled visit, Ms. Squalls left samples of Lipitor and Caudet, as usual.
She did not put the name of Mr. Stoll's nanny on the Lipitor box as Mr. Stoll had asked.  Instead,
she casually mentioned the name of the nanny to Dr. Verkler who became visibly upset.  Ms.
Squalls got the impression that Stoll's nanny came into Dr. Vekler's office often for free
samples.

4

20.     Later that year, Mr. Stoll again placed Ms. Squalls in an uncomfortable situation when she questioned his recommendation that Professional Healthcare Representatives should use "electronic call notes" regularly.  Electronic call notes are a software tool that allows Professional Healthcare Representatives to take notes on their computers after speaking with a physician.  After 2004, Pfizer instituted a company policy prohibiting the use of electronic case notes.  The policy was implemented after Pfizer was sued after company sales representatives recorded discussions regarding the "off-label" uses of Pfizer products with doctors.

21.     In October 2006, John Woychick, Pfizer's Senior Vice President of US Sales Operations and Training, sent a company-wide email addressing Pfizer's document retention policy. In response to the company wide email, Stoll sent an email to his staff telling them that call notes were the best way to keep records.  He later emphasized that the notes should only reflect "on-label discussions"

22.     In or about October 2007, Mr. Stoll began to investigate Ms. Squalls for call fraud.  At the time, Ms. Squalls had heard from other employees that Mr. Stoll was investigating someone, but had no idea that it was about her. Mr. Stoll did not have any valid reason to investigate Ms. Stoll. This investigation was discriminatory. No other member of Mr. Stoll's team was investigated.  The investigation was in retaliation for Ms. Squalls raising objections to the delivery of medication to the nanny and to the use of call notes.

23.     In addition, Ms. Squalls was subjected to three "random" drug tests with two weeks during August of 2007.  Mr. Stoll also had a random inventory test of Ms. Squalls samples conducted in September or October of 2007.  Ms. Squalls passed all of these tests.

24.     On November 30, 2007, Ms. Squalls received a phone call from Mr. Stoll. He told her that something had recently come to his attention and that she needed to meet with him and the Director of Human Resources, Andy Powell.

25.     On December 3, 2007, Ms. Squalls met with Mr. Stoll and Mr. Powell at the Regional Office in Denver. Stoll and Powell then began to accuse Ms. Squalls of falsifying forty-four "starter forms." Starter forms were forms that identified which doctors Ms. Squalls had visited and the amounts of drug samples that had been left. Mr. Stoll and Mr. Powell were apparently concerned with the fact that the dates on the forms had been visibly changed.

26.     Ms. Squalls explained that on many occasions a sales representative would visit a doctor on a certain day and fill out a starter form. She also reiterated to Mr. Stoll and Mr. Perry that if she was told to return the next day, then the representative simply writes over her previously written date to accurately reflect the day she met with the doctor. Correcting starter forms is common practice in the industry and with Pfizer employees. There are no rules prohibiting correcting a date on the form. Ms. Squalls had engaged in this conduct for seventeen years as an employee at Pfizer, and had never been reprimanded or disciplined. Ms. Squalls was not permitted to review the starter forms that they were objecting to. Other employees had the same practice with the starter forms. Further, starter forms were not reviewed in the regular course of business of Pfizer. Instead, they were sent to warehouses for storage.

27.     About mid-way through the interrogation it became clear to Ms. Squalls that Mr. Stoll was targeting Ms. Squalls because of the compliance issues involving call notes and the issue with his nanny, and was discriminating against Ms. Squalls. She confronted Mr. Stoll about these issues and the discriminatory treatment and asked to speak with an attorney. Mr.

6

Powell stopped the interrogation and told her that he would have a local Pfizer attorney call to discuss her allegations.

*Retaliation*

28.　　Two days later, on December 5, 2007, Suzanne Brackley, Pfizer's regional counsel, called Ms. Squalls to discuss her assertions that Stoll was targeting her with false accusations and discrimination. After the discussion, Ms. Brackley told her that someone would be calling her soon. On December 10, 2007, Ms. Squalls received a telephone call from Beverly Herd in Pfizer's Corporate Compliance group. She set a December 12, 2007 telephone conference to discuss all of these issues. On December 12, 2007, Ms. Herd called Ms. Squalls to inform her that the conference call had been canceled. Jim Gibney, an executive in Corporate Compliance, asked to have a face-to-face meeting in New York City. On December 17, 2007, Ms. Squalls met with Pfizer Corporate Compliance Counsel Niteesha Gupta and Senior Paralegal Stephen Rhoades. In New York, Ms. Squalls reiterated the reasons why she believed Mr. Stoll was targeting her.

29.　　After the meeting Ms. Squalls sent a letter to Ms. Gupta summarizing the topics discussed in the December 17th meeting. In addition, she related her experiences with Mr. Stoll and the racial comments made by him to her. She also told Ms. Gupta, that to her knowledge, Mr. Stoll had never, in eleven years of management with Pfizer hired an African-American. Ms. Squalls, who Mr. Stolls inherited after a 2005 realignment, is the oldest woman on his team, and the only African-American female on his staff. At the time there were two African-American males on his team, but neither had been hired by Mr. Stoll.

30.　　On January 4, 2008, Ms. Squalls attended a District New Year Kick-Off meeting with the other sales representatives and Mr. Stoll. The main topic for discussion at the meeting

was the results of a Gallop Poll, which surveyed sales representatives to get their opinions on Pfizer leadership, including district managers. The discussion focused on particular questions asked by the Poll including those where sales representatives rated management "low."

31.     One particular question dealt with how Pfizer handled discrimination issues. Because Ms. Squalls was the only African-American woman at the meeting, the participants looked to her to discuss the topic. Ms. Squalls was reluctant to give her opinion, but stated that the question did not make it clear as to whether the term "discrimination" referred to race, gender, or age. Mr. Stolls interrupted and stated that he "knew a lot of white males in the company who feel discriminated against when they are passed over for a promotion," referring to instances where a minority was promoted to a higher position. He continued by stating that he thought this was "reverse discrimination." The conversation continued to get more offensive when the topic began to discuss quotas and minority Pfizer employees who fill those quotes.

32.     On January 7, 2008, Ms. Squalls received an email from Ms. Gupta following up on their meeting in New York the previous month. Ms. Gupta told her that a Human Resources representative, Kerry Sorvino, was going to call her to discuss Ms. Squalls' discrimination claims. On January 8, 2008, Ms. Squalls spoke with Ms. Sorvino for approximately an hour about her charge of discrimination. The call was continued until January 10, 2009. Again, they could not conclude the call because of time restraints, so the call continued on January 14.

33.     Approximately one week after the final discussion with Ms. Sorvino, Mr. Powell called Ms. Squalls. Powell related to her that he had spoken with Mr. Stoll and that they had decided that all field days involving Ms. Squalls and Mr. Stoll were going to be suspended until the "matter had been resolved."

34.     On January 30, 2008, Ms. Sorvino called Ms. Squalls to inform her that the investigation into Mr. Stoll's noncompliance and discriminatory statements had concluded. She indicated to Ms. Squalls that Mr. Stoll's behavior was not in accordance with Pfizer policy or core values. She told Ms. Squalls that action would be taken but did not specify what kind of action. The very next day Mr. Stoll called Ms. Squalls and told her that she was subject to a new "realignment." She would stay in the same territory that she currently occupied, but report to a district manager in Colorado Springs.

35.     Just a few days later, on February 6, 2008, Ms. Squalls received a voicemail from John Post asking her to call Pfizer's regional office the following day so that he could "close out the investigation regarding work activity and call reporting" Ms. Squalls called the regional office on February 7th from her car. Mr. Post told her that Mr. Powell was also in the room. At that point Mr. Post informed her that she was being terminated, effective immediately, due to work activity, call reporting, and starter administration.

36.     On February 8, 2008, Ms. Squalls called Ms. Sorvion to discuss her termination. Ms. Squalls did not have any indication from Ms. Sorvino that her termination was imminent. Ms. Squalls told Ms. Sorvino that she did not think it was a coincidence that her termination occurred one week after she turned in an expense report to Mr. Stoll, which showed expenses related to her trip to New York with Corporate Compliance and one week after Ms. Sorvino closed out the HR investigation. Ms. Sorvino ended the conversation by telling Ms. Squalls that she did the "right thing" by calling her. Ms. Squalls has never received any information regarding whether Pfizer investigated her claim of retaliation.

37. On April 14, 2008, counsel for Ms. Squalls sent Pfizer Corporate Counsel a letter in accordance with the Colorado Rules of Evidence detailing Ms. Squalls' claims that she was

illegally and unjustifiably terminated. Three days later, on April 17, 2008, Pfizer sent a letter to the Food and Drug Administration where it claimed that Ms. Squalls submitted a "significant number of altered or otherwise overwritten transaction dates." The conclusions asserted by Pfizer were erroneous and were submitted in retaliation for Claims asserted against Pfizer in the letter sent by counsel.

<h3 style="text-align:center">FIRST CLAIM FOR RELIEF</h3>

<h3 style="text-align:center">DISPARATE TREATMENT (C.R.S. §§24-34-306, 402)</h3>

38. Ms. Squalls incorporates by reference the allegations contained in the proceeding paragraphs of the Complaint.

39. Ms. Squalls was subjected to disparate treatment by her employer, Pfizer, on account of race, color, and national origin. Ms. Squalls was treated differently than similarly situated Caucasian employees. This treatment included being subjected to criticisms, investigations, performance reviews, evaluation of work, and termination.

40. Other workers of different races, color, and national origin than Ms. Squalls were not subjected to the criticism, disparagement, unfair performance reviews, and termination for the same actions as Ms. Squalls.

41. Ms. Squalls was fully qualified for continued employment by Pfizer.

42. Ms. Squalls suffered disparate treatment by her employer, Pfizer, on account of race, color, and national origin.

43. Ms. Squalls suffered economic and non-economic damages as a result of disparate treatment by Pfizer, including loss of earnings, loss of earnings capacity, loss of fringe benefits, loss of future fringe benefits, emotional distress, and physical distress.

44. Pfizer violated C.R.S. § 24-34-402(1)(a) by the conduct herein.

45.     Ms. Squalls is entitled to recover damages for the discriminatory conduct described herein pursuant to the C.R.S. § 24-34-306 and the associated provisions of Parts 3 and 4 of Article 34 of Title 24, C.R.S..

## SECOND CLAIM FOR RELIEF

### RETALIATION (C.R.S. §24-34-306, 24-34-402)

46.     Ms. Squalls incorporates by reference the allegations contained in the preceding paragraphs of the Complaint.

47.     Ms. Squalls was subjected to retaliation for engaging in opposition to discrimination, in violation of public policy of the State of Colorado and C.R.S. §24-34-402(1)(e), including termination from her employment.

48.     Ms. Squalls suffered economic and non-economic damages as a result of such retaliatory treatment by Pfizer, including loss of earnings, loss of earnings capacity, loss of fringe benefits, loss of future fringe benefits, emotional distress, and physical distress.

49.     Ms. Squalls is entitled to recover damages for the retaliatory conduct described herein pursuant to C.R.S. § 24-34-306 and the associated provisions of Parts 3 and 4 of Article 34 of Title 24, C.R.S.

50.     Alternatively, Ms. Squalls is entitled to recover damages for the retaliatory conduct described herein which constitutes the common law public policy tort of retaliatory discharge.

## THIRD CLAIM FOR RELIEF

### DISPARATE TREATMENT

### (TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §§2000e, 2000e-5)

51.     Ms. Squalls incorporates by reference the allegations contained in the preceding paragraphs of the Complaint.

52.     Ms. Squalls was subjected to disparate treatment by her employer, Pfizer, on account of race, color, and national origin.

53.     Pfizer violated 42 U.S.C. §2000e-2(a)(1) by the conduct described herein.

54.     Ms. Squalls has exhausted her administrative remedies and otherwise complied with all statutory prerequisites to bringing this claim.

55.     Ms. Squalls is entitled to recover damages for the discriminatory conduct described herein pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-5.

56.     Ms. Squalls is also entitled to recover her reasonable costs and attorney's fees for bringing this action pursuant to 42 U.S.C. §2000e-5(k).

## FOURTH CLAIM FOR RELIEF

## RETALIATION

## (Title VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §§2000e-3, 2000e-5)

57.     Ms. Squalls incorporates by reference the allegations contained in the preceding paragraphs of the Complaint.

58.     Ms. Squalls was subjected to retaliation for engaging in opposition to discrimination, in violation of 42 U.S.C. §2000e-3, including termination from her employment.

59.     Ms. Squalls suffered economic and non-economic damage as a result of such retaliatory treatment by Pfizer, including loss of earnings, loss of earnings capacity, loss of fringe benefits, loss of future fringe benefits, emotional distress, and physical distress.

60.     Ms. Squalls is entitled to recover damages for the retaliatory conduct described herein pursuant to 42 U.S.C. §2000e-5.

61.     Ms. Squalls is also entitled to recover her reasonable costs and attorney fees for bringing this action pursuant to 42 U.S.C. §2000e-5(k).

**FIFTH CLAIM FOR RELIEF**

**RACE DISCRIMINATION**

**(42 U.S.C. §1981)**

62.     Ms. Squalls incorporates by reference the allegations contained in the preceding paragraphs of the Complaint.

63.     Ms. Squalls, as an African American employee, was subjected to a pattern and practice of discrimination in her terms and conditions of employment perpetrated by the Defendant because of her race.  In addition, the Defendant condoned a racist hostile work environment and repeatedly and knowingly subjected Ms. Squalls to this environment, including a pervasive pattern of offensive remarks about Plaintiff's race.

64.     This type of treatment was so severe and pervasive that it altered the conditions of Plaintiff's employment and had an adverse impact on Plaintiff's working environment.  Plaintiff has suffered and will continue to suffer in the way of economic losses due to discriminatory conduct set forth above, as well as non-economic injuries, such as emotional harm.

65.     Pfizer knew or should have known of the harassment and hostile environment perpetrated by management and other employees, and failed to take immediate and appropriate remedial action.  Additionally, Defendant terminated Plaintiff based on her race—African American.  Defendant's conduct toward Ms. Squalls was in violation of 42 U.S.C. §1981.  Moreover, Defendant's conduct towards Ms. Squalls was malicious, willful, and in gross disregard of her federally protected rights, thereby subjecting Plaintiff to punitive damages.

66.     Ms. Squalls has suffered damages as a result of this discrimination including but not limited to lost compensation, lost earning capacity, lost benefits, and emotional harm.

## SIXTH CLAIM FOR RELIEF

## RETALIATION

## (VIOLATION OF 42 U.S.C. §1981)

67.     Ms. Squalls incorporates by reference the allegations contained in the preceding paragraphs of the Complaint.

68.     Ms. Squalls engaged in statutorily protected expression by opposing Pfizer's unlawful employment practices as described above.

69.     Ms. Squalls complained to Human Resources and Corporate Compliance several times after discriminatory and unfair treatment by Mr. Stoll.

70.     Rather than take appropriate corrective measures, Defendant knowingly and willfully retaliated against Plaintiff for complaining about the discriminatory treatment.  The retaliation included ultimately terminating Plaintiff's employment.  Defendant's retaliatory conduct toward Plaintiffs was malicious, willful, and in gross disregard of their federally protected rights, thereby subjecting Defendant to punitive damages as well.

71.     As a result of the retaliation by Defendant, Plaintiff has suffered and continues to suffer injuries, including but not limited to emotional distress and economic losses.

## SEVENTH CLAIM FOR RELIEF

## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

72.     Ms. Squalls incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

73.     Colorado has well established public policy prohibiting an employee from being required to chose between obeying an employer's order to violate the law or losing his or her job.

74.     Defendant required Ms. Squalls to chose between her employer's orders to deliver samples to Mr. Stoll's nanny in violation of Colorado and federal law, or facing retaliation and losing her job.

75.     Ms. Squalls was subject to retaliation and termination for her refusal to deliver drugs to Mr. Stoll's nanny.

76.     Allowing Defendant to terminate Ms. Squalls for her refusal to violate federal and state laws without consequence would allow a valuable social policy to go unvindicated.

77.     Defendant's termination of Ms. Squalls in violation of public policy caused her to suffer injuries, damages, and losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sandra Squalls, prayers for relief as follows:

1.     Pecuniary damages, including lost wages, loss of fringe benefits, loss of future earnings, and impairment of future earning capacity;

2.     Non-pecuniary damages, including but not limited to, mental anguish, emotional distress, physical distress and loss of enjoyment of life;

3.     Pre-judgment interest and post judgment interest as provided for by law;

4.     Attorneys' fees, costs, and expenses of this action as provided for by law;

5.     Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 27th day of December, 2010.

Respectfully submitted,

**BERENBAUM WEINSHIENK PC**

*Original signature on file at Berenbaum Weinshienk PC*

s/ *Courtney Lee Tawresey*

Rosemary Orsini
Courtney Lee Tawresey
370 Seventeenth Street, Suite 4800
Denver, Colorado 80202
Telephone: (303) 592-8305
Facsimile: (303) 629-7610

16